OPINION
Daniel Vasquez is an inmate in the custody of the Ohio Department of Rehabilitation and Correction ("ODRC"), incarcerated in the Southern Ohio Correctional Facility in Lucasville, Ohio. On November 11, 1996, Mr. Vasquez was attacked by fellow inmates and sustained injuries as a result.
On December 8, 1997, Mr. Vasquez filed a complaint in the Ohio Court of Claims, naming ODRC as the lone defendant. The complaint alleged that Mr. Vasquez's injuries were the direct and proximate result of ODRC's negligence, the particulars of which are discussed below.
In May 1999, the Court of Claims conducted a trial on the sole issue of liability. In a decision rendered and journalized on January 13, 2000, the court ultimately rendered judgment in favor of ODRC.
Mr. Vasquez's counsel filed a "request for separate findings of fact and conclusions of law," and a motion seeking a new trial. The trial court summarily overruled both motions pursuant to an entry journalized March 7, 2000.
Daniel Vasquez (hereinafter "appellant") has timely appealed from the judgment of the Court of Claims, assigning three errors for our consideration:
ASSIGNMENT OF ERROR NO. 1:
 The trial court erred and abused its discretion in ruling there was neither actual nor constructive notice of the danger of knives and cuff keys being present in K-Block and ignoring evidence the escort officers were inattentive to obvious attempts to escape the chain and in failing to follow procedures in searching inmates prior to being placed on the rec chain.
 ASSIGNMENT OF ERROR NO. 2:
 The trial court erred and abused its discretion in not finding the defendant-appellee negligent in not properly conducting the required search of inmates placed on the rec chain.
 ASSIGNMENT OF ERROR NO. 3:
 The trial court's decision is against the manifest weight of the evidence.
Because appellant's third assignment of error requires a recitation of the facts giving rise to his claim, we address it first. Most of the pertinent facts are not in dispute.
On the date of the incident, appellant was housed in a disciplinary segregation unit, K-Block. He and nine other inmates were to be transported from K-Block to a recreation area. ODRC's procedure for the transfer required the inmates first to be strip-searched while naked and their clothing examined separately before the inmates are permitted to dress. Following the searches of their persons and clothing, the inmates are then individually handcuffed from behind, shackled with leg irons, and secured together by a "belly band" attached to a ten-person "travel" chain. Prison policy and procedure require the inmates to be supervised by corrections officers at every step of this process.
Corrections Officers Gary L. Williams and Edwin H. Benner were assigned to escort the prisoners from their cells to the recreation area. Other officers had performed the strip searches prior to the arrival of escorts Williams and Benner. According to Officer Williams's testimony, as indicated above, the inmates are never supposed to be out of an officer's sight during the entire search and transfer procedure.
Officer Williams described in detail the mandatory search procedure:
 When you strip search the inmate, do you have him step outside the cell?
We strip him in the cell.
All right. But you're there where you can actually see?
A. Yeah.
 And you look at him carefully to make sure there's no weapons, right?
Right.
 Do you continue to watch what do you do with his clothing while you're doing that? Is it laying someplace?
 He takes all of his clothing off, you strip him you check him, go through his hair, mouth, the whole thing, check his clothing, then you hand it to him and he puts it on.
All right. You've indicated you go through his mouth.
 You make him open up his mouth and check to make sure he's got nothing in his mouth, right?
Yes.
 Check his hair to make sure he hasn't hidden anything in his hair?
Right.
 You also pat down the clothing to make sure there's nothing in the clothing?
Yes, sir.
Then do you watch him put the clothing back on?
 You watch him the whole time you're with him. [Tr. 14-15.]
With respect to the strip-search portion of the process, Officer Benner detailed how thoroughly the strip search is to be conducted:
 A. * * * They put their clothes in the bars, and they're standing there naked, and they we, as officers, check their clothes thoroughly, their shoes. And then they we strip search yeah, strip search them: Have their have them open their mouth, if they've got any hair, flip it back and forth; take and check under their arms; the bottoms of the feet; spread their cheeks; lift their testicles. [Tr. 37-38.]
The inmates, secured on the chain approximately twelve inches apart, walked single file toward the recreation area. According to Officer Williams's testimony, he noticed the chain being pulled and then saw several inmates become free of their restraints. The record indicates that one inmate was able to slip out of his handcuffs due to the small size of his wrists. At least two other prisoners were freed from their handcuffs by using inmate-manufactured handcuff keys.
Officer Williams observed an inmate attack appellant with a "shank," an inmate-manufactured, knife-like weapon approximately twelve inches in length. The shank was apparently made from the heavy plastic food trays used in the prison. According to appellant, the inmates attacked him because they believed he was a "snitch."
According to Officer Williams, he attempted to intervene and stop the assault while Officer Benner radioed for assistance. Eventually, other officers arrived and subdued the offending inmates. Appellant, handcuffed and unable to defend himself, suffered lacerations and contusions to his body, including his head, neck and arms.
Officer Benner testified that no inmate has ever freed himself from the chain when he has performed the required search of the prisoner and the prisoner's clothing. The officer also described a "black box" device the prison uses to prevent inmates from gaining access to anything like handcuff keys. The device goes over the inmate's hands and is used on everyone who goes out; however, it was obviously not used on the day of this incident. Although the officer stated that this was now standard procedure, he did not think that such procedure was in existence at the time of the attack on Mr. Vasquez.
Both Officers Williams and Benner offered testimony essentially opining that had the search and transfer process been conducted properly, appellant would not have been beaten and stabbed by inmates armed with a foot-long weapon.
Several inmates testified regarding certain prison procedures. According to at least one inmate, prisoners have freed themselves from the chain in the past. The attack on appellant was not the first of its kind.
Inmate Louis Lebron testified that he was also in a segregation K-Block cell on the date of the incident. According to him, during transfer to recreation, the officers are supposed to watch the inmates continually during a "shakedown," the search, shackling, and transfer process. However, Lebron claimed that "they don't always." Instead, Lebron said, the guards "get to talking among each other[,] * * * looking that way, looking this way."
The primary basis of appellant's claim, incorporated into each of the assignments of error, is that the ODRC was negligent in failing to follow its own procedures; in particular, the corrections officers failed to conduct a sufficient search of the inmates, which search should have led to the discovery of the foot-long shank used to assault him, as well as the homemade handcuff keys.
Preliminarily, we note the well-established standard by which we are bound in reviewing a manifest weight claim. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley ConstructionCo. (1978), 54 Ohio St.2d 279, syllabus.
Ohio law imposes a duty of reasonable care upon the state to provide for its prisoners' health, care and well-being. As in all negligence cases, to maintain an action in negligence, a prisoner-plaintiff must demonstrate that the defendant owed him a duty of care, that the defendant breached that duty, and that the breach proximately caused his injuries. Williams v. Southern Ohio Correctional Facility (1990),67 Ohio App.3d 517, 525-526, citing Wellman v. East Ohio Gas Co. (1953),160 Ohio St. 103. A plaintiff must show that "the actions giving rise to his injuries were foreseeable by prison officials." Williams, supra, at 526. As noted by the Court of Claims in this case, and the theory relied upon by ODRC, prison officials owe a duty of reasonable care "to the inmates under their charge but are not insurers of their safety." Id.
The court below cited Baker v. State (1986), 28 Ohio App.3d 99, for its conclusion that the "law is well settled in Ohio that the state is not liable for the intentional attack on one inmate by another unless there is adequate notice of an impending assault." The court undertook an extensive analysis of the lack of notice or foreseeability of an attack and ultimately deemed it dispositive of ODRC's lack of liability.
The lower court's decision is silent on the issues pertaining to the negligence of the conducting of the search and supervision evidenced by this record. In fact, language in Baker, a case readily factually distinguishable from this one, is instructive:
 * * * The procedure followed by the guards was considered adequate by an expert witness. There was testimony that the guards followed their normal procedure on the day appellant was assaulted. Therefore, appellees did not violate R.C. 2921.44(C)(5) by negligently failing to follow procedure and there was no negligence per se. [Id. at 100.]
In stark contrast, the record before us is replete with testimony from many witnesses, including corrections officers, that "normal procedure," established by the institution's own policy requiring a head-to-toe invasive strip search, was not followed in this case. There was irrefutable testimony evidencing that a strip search which does not reveal the presence of a foot-long shank is negligently performed.
To review only a portion of that testimony, Corrections Officer Gary L. Williams indicated that the inmates had two shanks, at least one of which was colored plastic. (Tr. 27.) A shank was used to assault inmate Vasquez, opening a gash on his forehead which required eight stitches to close. A shank was also used by Louis Lebron, an inmate attempting to protect inmate Vasquez. As noted above, the shank or shanks were reported to be about twelve inches in length.
Inmate Lebron denied having a shank and did not acknowledge having cuff keys himself. Instead, he claimed his wrists were so small he could merely slip off his handcuffs.
Dennis R. Jones, another inmate who observed the assault, testified that only one shank was involved, but that the inmate who assaulted Mr. Vasquez with the shank later dropped it. Inmate Lebron then picked up the shank and attempted to use it.
Inmate Vasquez described the shank as being eleven and one-half inches to twelve inches in length and made out of a substance like plexiglas. He also claimed that inmate Lebron picked up the shank used by inmate Robinson who attacked Mr. Vasquez. Inmate Lebron did nothing but protect Mr. Vasquez according to Mr. Vasquez.
Although ODRC cannot be held liable for every inmate who strikes another inmate with a fist, ODRC has an ongoing obligation to see that deadly weapons are not transported around the interior of Ohio's prisons, especially the Southern Ohio Correctional Facility ("SOCF"). When inmates who are known security risks are being moved from one area of a maximum security prison to another area of the prison, ODRC needs to assure that the inmates are not transporting foot-long knives. Both inmates and corrections officers are at risk of serious physical harm or even death if reasonable care is not used to discover the existence of such weapons in the prison and to assure that the weapons are not in the possession of inmates outside their cells.
The decision of the Ohio Court of Claims as to the liability of ODRC for the use of the shank in the assault on inmate Vasquez is against the manifest weight of the evidence. We do not find that ODRC is liable for the mere fact inmate Vasquez was assaulted. The testimony about the size of the cuff keys was so sparse that we cannot say the corrections officers were negligent in failing to discover them or failing to prevent their use in freeing inmate Robinson from the travel chain. However, ODRC is liable for its failure to prevent the use of the foot-long shank in the assault.
The third assignment of error is sustained.
The first and second assignments of error are sustained to the extent they include allegations of negligence in the search and supervision procedure with respect to the shank or shanks.
Having sustained the assignments of error, the judgment of the Court of Claims is reversed with instructions to enter judgment in favor of appellant consistent with this opinion and to conduct further proceedings to determine appropriate damages.
PETREE and BROWN, JJ., concur.